UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81205-CIV-MATTHEWMAN

SUSAN MARIE WHEATLEY,

     Plaintiff,

v.

CAROLYN W. COLVIN[1],
Acting Commissioner of Social Security
Administration,

     Defendant.

_____/



FILED by _____ D.C.

MAY 2 6 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 17, 18]

**THIS CAUSE** is before the Court upon Plaintiff, Susan Marie Wheatley's ("Plaintiff")

Motion for Summary Judgment and Memorandum of Law in Support Thereof [DE 17], and

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security Administration's

("Defendant") Motion for Summary Judgment with Supporting Memorandum of Law and

Response to Plaintiff's Motion for Summary Judgment [DE 18]. The parties have consented to

magistrate judge jurisdiction. [DE 13]. The issues before the Court are whether the record

contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct

legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] As of January 23, 2017, Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* Social
Security Administration, *The Acting Commissioner of Social Security*,
https://www.ssa.gov/agency/commissioner.html. However, for consistency, the Court will continue to use the
party named in the Complaint, Carolyn W. Colvin. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance
with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner
of Social Security or any vacancy in such office.").

1

# I.   FACTS

On February 6, 2013, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, asserting a disability on-set date of June 15, 2012.   [R. 17].[2]   The application was denied initially and upon reconsideration.   *Id.*   Following a video hearing on December 3, 2014, the Administrative Law Judge Charles Woode (the "ALJ") issued a decision on May 15, 2015, denying Plaintiff's request for benefits.   [R. 14-29].   A request for review was filed with the Appeals Council and denied on May 4, 2016.   [R. 1-7].

## A. Hearing Testimony

The ALJ held a video hearing on December 3, 2014.   [R. 30].   Plaintiff's counsel began by stating her theory of the case, which was that Plaintiff has suffered from long-term alcohol abuse and a stroke that occurred in 2009.   [R. 34].   According to Plaintiff's counsel, since 2009, Plaintiff's condition has worsened but she has not undergone any therapy for her depression, stroke, or alcohol abuse.   *Id.*

Plaintiff stated that she was born on February 27, 1957, making her fifty-seven years old at the time of the hearing.   [R. 35].   According to Plaintiff, she has a driver's license and drives about three times a week to places that are close to her house, but she stated that she gets anxious driving and does not drive on the interstate.   [R. 36].   She attended a "three-year diploma school" and has a degree in nursing.   *Id.*   Plaintiff stated that she stopped working sometime in 2011 because her consulting work was starting to become unavailable.   [R. 37].   Plaintiff testified that she had been working as a registered nurse until 2006.   *Id.*

She explained that she cannot work a full-time job now because she had a stroke and had to have a hole in her heart patched, which is why she takes multiple medications, including one

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 12.

that controls her heart rate. [R. 38]. Plaintiff stated that when she wakes up in the morning sometimes her heart rate is 140 and she feels fatigued. *Id.*

Plaintiff testified that on a regular basis she sees her internist, Dr. Dennis Egitto, and her neurologist, Dr. Charles Schallop. *Id.* Further, she sees a cardiologist, Dr. Villa. *Id.* She stated that she takes Metoprolol twice a day, which keeps her heart rate down, Synthroid for her thyroid, Aspirin, Clonazepam for severe cramps in her leg, and Toprol for high cholesterol. [R. 38-39]. Further, Plaintiff takes Trazodone for depression and to help her sleep at night. [R. 39]. According to Plaintiff, the Trazodone helps with her depression but it does not always keep her asleep. *Id.*

Plaintiff testified that the last time she was hospitalized was January 15, 2013, because her right side had become weaker and she thought she had another stroke. [R. 40]. However, she was only malnourished. *Id.*

Plaintiff stated that she stopped using alcohol in May of 2014. *Id.* She said that she is currently not in any pain. *Id.* Plaintiff testified that sitting is not a problem for her, but walking and using her right hand are problematic. *Id.* Plaintiff stated that she was right-hand dominant and that her stroke affects her right side, including causing her trouble writing and walking. [R. 35, 40]. She stated that she has to wear solid sneakers because she has poor balance. *Id.* Plaintiff also estimated that she can only stand for ten to fifteen minutes at a time. [R. 41]. She stated that she could probably lift ten pounds but that her right hand is very weak and she cannot lift with it nor do other things that would come easy to someone else. *Id.*

Plaintiff testified that she does not cook, vacuum, mop the floor, do any yard work, or clean her house. [R. 42-43]. However, Plaintiff explained that she does rinse off dishes and put them in the dishwasher, pay her bills over the phone, do laundry, take out the trash, and go

grocery shopping. *Id.* She also testified that she takes care of her fifteen-year-old cat and does not have any hobbies. [R. 43].

Then, Plaintiff's counsel asked questions of Plaintiff. *Id.* Plaintiff admitted that she was an alcoholic, but stated that she had been sober since May of 2014 after she completed "rehab." [R. 44]. According to Plaintiff, she goes to Alcoholics Anonymous meetings twice a week. [R. 45]. Plaintiff stated that she recently had some CAT scans that showed that she had "diffuse injury, which could be age related or from alcohol." [R. 45-46]. Plaintiff's counsel told the ALJ that she made an appointment with a neurologist named Dr. Siddiqui for Plaintiff to meet with, and counsel asked for twenty-one days after the hearing to admit the results of that examination to the ALJ.[3] [R. 46]. The ALJ agreed to allow counsel twenty-one days to admit these Dr. Siddiqui records into the record. *Id.*

Plaintiff then testified about the last job she worked at before she became disabled. According to Plaintiff, she worked as an independent contractor nurse consultant for a law firm on medical malpractice and product liability cases. [R. 47]. As a consultant, Plaintiff testified that she did not type but she had a transcriptionist who would type for her. [R. 48]. Further, Plaintiff stated she had to carry and lift boxes of medical records. *Id.* Plaintiff stated that she started to have trouble concentrating and focusing on what she was doing at her job. [R. 48].

According to Plaintiff, she has a stool that she uses to get into her bed and she has a shower chair that she uses in her shower because of her fatigue. [R. 53]. Plaintiff stated that when she goes to the grocery store she tries not to use both her hands to lift a gallon of milk because she is trying to build strength in her right hand. [R. 57-58]. She also testified that her

---

[3]Dr. Siddiqui, a neurologist, referred Plaintiff to Dr. Renfrow, a psychologist for the Center of Neurology and Center for Psychology in Delray Beach, Florida. [R. 515]. Plaintiff submitted the records of Dr. Renfrow on December 23, 2014. [R. 517-34].

hands sometimes shake. [R. 58].

Next, Mark Anderson, a vocational expert, testified. [R. 59]. He classified Plaintiff's past work as a registered nurse at the medium level of exertion and as a skilled occupation and her work as a nurse consultant at the sedentary level of exertion and also as a skilled occupation. [R. 60]. The ALJ posed the vocational expert a hypothetical in which an individual was limited to working at the light exertional level, only frequently handling with the right hand, never climbing ladders, ropes or scaffolds, and should avoid all exposure to hazards such as unprotected heights and dangerous machinery. *Id.* Given those facts, the expert found that the individual could perform past relevant work as a nurse consultant. *Id.* The expert further stated that, if the individual was unable to perform past work, the individual could work as a phlebotomist (light exertion level and semi-skilled), a first aide attendant (light exertion level and semi-skilled), or a cardiac monitor technician (sedentary exertion level and skilled). [R. 61].

Next, the ALJ posed a hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual could only perform sedentary work. *Id.* The expert responded that such an individual could perform past work as a nurse consultant or could work as a cardiac monitor technician. *Id.*

The ALJ posed a third hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual was limited to sedentary work and, due to the combination of their impairments, could not work for eight hours a day for five days a week. [R. 62]. The expert responded that there would be no work for an individual who was so limited. *Id.*

Plaintiff's counsel then asked a few questions of the vocational expert. *Id.* Counsel asked if the nurse consultant job required a good deal of concentration, to which the expert

testified that he could only say that a nurse consultant would be required to adhere to temperament "D," "which means they have to direct, control and plan activities…beyond giving and receiving simple instructions." *Id.* Further, the expert stated that the cardiac monitor technician was classified as a stressful occupation in which an individual must use judgment and work under specific instructions. [R. 64]. The first aide attendant was also classified as a stressful occupation where an individual must deal with people beyond giving and receiving simple instructions and must use their judgment. [R. 65].

## B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

Plaintiff suffered a stroke on January 2, 2009, and experiences right-sided weakness as a result of the stroke. [R. 391]. Apparently, Plaintiff had a hole in her heart since birth, which caused the stroke. [R. 527]. Plaintiff had a CT scan and was diagnosed with "acute nonhemorrhagic left basil ganglia infarct." [R. 399]. Further, after an echocardiogram, the impression was that Plaintiff had "an atrial septal aneurysm with a small open patent foramen ovale with left to right shunt, and positive bubble test." [R. 391].

On July 15, 2009, Plaintiff saw Dr. Sharon Andrade-Bucknor for an echocardiogram. [R. 319-20]. Dr. Andrade-Bucknor concluded that a diastolic filling pattern indicated impaired relaxation. [R. 320]. Further, she concluded that there was "increased echogenicity of the interatrial septum consistent with an interatrial closure device." *Id.*

Plaintiff presented to Dr. Charles Schallop from approximately May 31, 2011 through July 16, 2013. [R. 324, 325-43, 344, 434-43, 454-66, 501]. Dr. Schallop noted that Plaintiff had left-based ganglia infarction with right leg cramping at nighttime and status post-PFO

procedure with placement of an Ampiatzer cribriform occlude. [R. 325]. On May 31, 2011, Plaintiff had a stable neurological examination and Dr. Schallop stated that Plaintiff was able to work full-time.[4] *Id.* However, Dr. Schallop noted that he urged Plaintiff to quit smoking and that Plaintiff would be prescribed Klonopin. *Id.* After a scan in March of 2012 showed that Plaintiff had elevated LFT of the liver, she reported back to Dr. Schallop. [R. 336]. In July of 2012, Dr. Schallop saw Plaintiff again and he stated Plaintiff was responding well to Klonopin for her right leg cramping at nighttime, she had apparently stopped smoking, and her neurological exam was normal. [R. 338].

However, on January 15, 2013, Plaintiff had an emergency office visit with Dr. Schallop because a month prior to the visit she was experiencing weakness, lethargy, dizziness, and unsteady gait. [R. 342, 434]. Dr. Schallop admitted Plaintiff to the hospital "for progressive neurological symptoms with tachycardia" and possibly atrial fibrillation/malignant cardiac rhythms. *Id.*

From January 15 through January 17, 2013, Plaintiff was hospitalized at Palm Beach Gardens Medical Center. [R. 366]. The records note that Plaintiff was admitted with neuromuscular weakness and seemed to be symptomatic of hyponatremia.[5] *Id.* Plaintiff denied any chest discomfort, tightness, or pressure, reported moderate alcohol consumption, and reported her history as a smoker. [R. 367]. After being examined for neurovascular disease and having a cardiology consultation, Plaintiff was diagnosed with hyponatremia multifactorial,

---

[4] According to Plaintiff's counsel and sister, Carol Witschel, Plaintiff was unable to work full-time at this point but was not being honest with her doctors about her ability to work. [DE 20, p. 2]. Plaintiff did have income of $16,000 from Critical Advocates, Inc. for the year 2011 according to Plaintiff's Detailed Earnings Query; however, Plaintiff did not have any earnings for the years 2012, 2013, and 2014. [R. 215-19].

[5] Hyponatremia is a "condition that occurs when the level of sodium in your blood is abnormally low." *Hyponatremia*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/hyponatremia/basics/definition/con-20031445 (last visited Feb. 16, 2017). Depending on the cause of hyponatremia, an individual may only need to reduce their alcohol intake. *Id.*

which was corrected, hypokalemia (low potassium), and hypothyroidism, in addition to having a thyroidectomy in the past. [R. 366]. The hospital adjusted Plaintiff's medication because she seemed "to be noncompliant with her oral supplement." [R. 366]. Further, Plaintiff's EKG revealed sinus tachycardia and her MRI showed "mild atrophy with white matter pathology suggestive of mild microvascular ischemic changes." [R. 372, 389].

Plaintiff then reported to Dr. Augusto Villa on January 24, 2013, for her abnormal EKG and heart murmur. [R. 467-79]. Dr. Villa noted that Plaintiff's echocardiogram confirmed that Plaintiff's PFO closure device was functioning normally. [R. 468]. After Plaintiff was started on beta blocker therapy for tachycardia she reported feeling better and planned to start physical therapy. *Id.* Plaintiff reported that she was still smoking cigarettes every day and stated that she drank 1-2 glasses of wine per night. [R. 469]. Dr. Villa said that Plaintiff appeared well developed, well nourished, and in no acute distress, but he did state that Plaintiff had an abnormal heart rate. [R. 469-70]. Plaintiff was advised to quit smoking, avoid stimulants like caffeine and alcohol, and monitor her blood pressure and heart rate twice a day. [R. 470].

On May 9, 2013, Sheila Clark Jackson completed a Disability Determination Explanation. [R. 69-77]. Plaintiff alleged disability due to "a stroke, anemia, right leg tremors, hypothyroidism, and depression." [R. 74]. Ms. Jackson determined that Plaintiff suffered from one severe impairment—CVA, late effects of cerebrovascular disease. *Id.* Ms. Jackson also determined that Plaintiff's exertional limitations were the following: occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of six hours in an eight-hour workday, sitting for a total of six hours in an eight-hour workday, and unlimited pushing or pulling other than lifting and/or carrying. *Id.*

Finally, Ms. Jackson determined that Plaintiff could perform her past relevant work as a nurse consultant as it was actually performed. [R. 76-77]. She found Plaintiff to not be disabled. *Id.*

Plaintiff presented to Dr. Schallop again on July 16, 2013, for a follow-up visit. [R. 501]. Dr. Schallop stated that Plaintiff was neurologically stable, smoked about ¼ of a pack of cigarettes per day, worked at Glades Medical Center in the ICU, and was going to start Zoloft "per psychiatry." *Id.* Plaintiff was advised to continue her use of Klonopin because she was at "high-risk for withdrawal symptoms." *Id.* Dr. Schallop stated that Plaintiff had improved and told her to continue working in the critical care unit at Glades Medical Center. *Id.*

It appears that Plaintiff consulted a psychiatrist, Dr. Philip Scharfer, M.D. in July of 2013 for depression and anxiety.[6] [R. 303]. Plaintiff presented to Dr. Scharfer for "depression secondary to physical problems" and the doctor diagnosed Plaintiff with dysthymic disorder.[7] *Id.*

Plaintiff's attorney, Carol Witschel, who is also her sister, completed a Function Report-Adult for Plaintiff on August 19, 2013. [R. 251-58]. Plaintiff stated that her conditions limit her ability to work because she fears driving outside of her "immediate home area," she cannot concentrate, she lacks coordination and is unstable when walking, her hands shake, she has difficulty sleeping through the night, she has a weak appetite, she has a racing heart, she gets anxiety in social situations, and she has depression. [R. 251]. According to

---

[6] The Court notes the questionable reliability of this document as it is one page of handwritten notes without a proper heading and not received directly from the medical source. It was attached as an Exhibit to a letter that Plaintiff's attorney wrote to the Office of Disability Administration on November 17, 2014, which was just weeks before Plaintiff's hearing in front of the ALJ.

[7] Dysthymic disorder is a "continuous long-term (chronic) form of depression." *Persistent Depressive Disorder (Dysthymia)*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (last visited Feb. 16, 2017).

Plaintiff, she wakes up every day in a state of severe anxiety, takes her medication, watches television, feeds her cat, and occasionally shops for necessities, talks on the phone, naps, and sleeps on her sofa rather than in her bed. [R. 252]. Plaintiff stated that she lost interest in her former hobbies of reading, gardening, shopping, socializing, and going to the beach. [R. 255]. She also alleged that she gets angry and argumentative in response to any disagreement and cries frequently. [R. 256]. Plaintiff indicated that her conditions affect her lifting, squatting, bending, standing, reaching, walking, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. *Id.* She alleged that she can only pay attention for a few minutes at a time and does not finish what she starts. *Id.*

On September 12, 2013, Dr. Trina Christner completed a Disability Determination Explanation—Reconsideration. [R. 80-92]. Plaintiff admitted that she had an alcohol problem. [R. 81]. Dr. Christner concluded that, in addition to CVA, Plaintiff also suffered from anxiety disorders, which were nonsevere. [R. 87]. Dr. Christner concluded that, under the "paragraph B" criteria of the listings, Plaintiff's anxiety disorders mildly restrict her activities of daily living, cause Plaintiff to have mild difficulty with social functioning, cause Plaintiff to have mild difficulty in maintaining concentration, persistence or pace, and do not cause Plaintiff to have any repeated episodes of decompensation of extended duration. [R. 88]. Dr. Christner noted that, although Plaintiff claims that she has depression and had been treated with Klonopin, Plaintiff's symptoms had not prompted a referral to a psychiatrist and she was not diagnosed with depression. *Id.* Plaintiff was again found to not be disabled. [R. 92].

On March 11, 2014, Plaintiff's former employer, Calvin Warriner, submitted an email to Plaintiff's counsel. [R. 297]. Mr. Warriner claimed that Plaintiff was his "go-to nurse paralegal for almost 20 years" because she was thorough, meticulous, and had extensive

10

knowledge of critical care nursing. *Id.* According to Mr. Warriner, Plaintiff's work product began to deteriorate around 2005 when she "became slow and started missing deadlines," started making excuses for turning in work late, and her work became sloppy. *Id.* Mr. Warriner alleges that around 2011 he stopped sending her work because he could no longer "in good conscience bill clients for her work." *Id.*

Plaintiff was admitted to Clarita Way for alcohol abuse rehabilitation on April 6, 2014, and was discharged on May 20, 2014. [R. 502-14]. Plaintiff stated that she had a long history of alcohol abuse, which had gotten progressively worse, as she was drinking about one to two liters of chardonnay per day. [R. 502]. The records indicate that the doctors wanted to taper Plaintiff off Klonopin after seven days in rehab. [R. 503]. During her stay, Plaintiff complained of lower extremity edema because she was on her feet and ambulating a lot, but that improved after a few days when Plaintiff elevated her legs and increased her fluid intake. [R. 504-05]. Further, Plaintiff complained of neck pain on her right side that was radiating down to her scapula. [R. 506]. The doctor recommended that Plaintiff take ibuprofen and that she continue therapy and exercise, as Plaintiff stated that exercise relieved the pain. *Id.*

Plaintiff's daughter, Erica Wheatley Disner, submitted a letter dated November 5, 2014. [R. 283-85]. Ms. Disner asserted that Plaintiff had been incapable of "responsible, meaningful work in her trained field of nursing or nurse consulting, for at least two years" because of Plaintiff's depression and substance abuse. [R. 283]. According to Ms. Disner, Plaintiff's alcoholism and depression worsened when Ms. Disner went off to college in or around 2000 and throughout her undergraduate years. [R. 283-84]. Ms. Disner noted that, in 2009, Plaintiff had a stroke and traveled to Miami for medical treatment following the stroke. [R. 284]. She also noted that Plaintiff had packed multiple water bottles filled with vodka in her suitcase. *Id.*

According to Ms. Disner, Plaintiff recovered physically after her stroke but never seemed to mentally recover, as she continued to be depressed and was hospitalized for malnutrition. *Id.* Ms. Disner stated that after Plaintiff left rehab, she relapsed for a few days and became hostile towards Ms. Disner, and ultimately did not attend Ms. Disner's wedding. [R. 285].

On November 13, 2014, Matt Witschel, Plaintiff's brother, wrote an email to Carol Witschel. [R. 286-87]. Mr. Witschel stated that after he recently visited Plaintiff she appeared weak and fragile and opined that a hiring manager would not hire her for any type of work. [R. 286]. He explained that when he entered her home it was in shocking disarray with newspapers piled up, dirty dishes around the home, the kitchen was dirty, and there were expired foods in the refrigerator. *Id.* Mr. Witschel noted that Plaintiff, who is only fifty-seven years old, is frail and moves around slowly as if she were in her 80's or 90's. *Id.* He observed that Plaintiff was "repeating herself often and generally not making sense most of the time," and he said that he believed some of her physical limitations are the result of her stroke. *Id.*

Plaintiff's sister and representative in this case, Carol Witschel, submitted a letter on November 17, 2014. [R. 288-296]. Attached to this letter were exhibits, which were letters from family and friends of Plaintiff describing her condition. [R. 297-309]. In her letter, Ms. Witschel stated that Plaintiff was "in denial concerning the main source of many of her debilitating health (physical and mental) problems: long term alcohol abuse." [R. 288]. According to Ms. Witschel, Plaintiff was a functioning alcoholic for many years, as she drank too much but still managed to work "fairly consistently." [R. 289]. Ms. Witschel stated that Plaintiff had a stroke on January 2, 2009, and was subsequently diagnosed with a congenital hole in her heart, which caused the stroke. *Id.* After the stroke, Ms. Witschel said that Plaintiff made a full recovery besides her fine motor skills on her right side, which is illustrated by her

12

handwriting. *Id.* Ms. Witschel noted that Plaintiff had the hole in her heart patched. *Id.* Further, Ms. Witschel stated that Plaintiff was diagnosed in January of 2013 with malnutrition, which was causing Plaintiff to have a racing heart, weakness in her limbs, and irrational behavior. [R. 291]. According to Ms. Witschel, Plaintiff has been drinking since she left rehab in May of 2014 and has become very hostile and angry towards her family again. [R. 293-94]. Ms. Witschel claimed that Plaintiff is now living off withdrawals from her 401K savings and is paying a 10% penalty for withdrawing those funds early. *Id.*

On December 18 and 19, 2014, Plaintiff presented to Dr. Stephanie Renfrow, a clinical psychologist, to discuss Plaintiff's current level of psychological and cognitive functioning. [R. 517, 526-34]. Dr. Renfrow submitted a letter after consulting with Plaintiff. Plaintiff complained of "memory loss and severe emotional distress," but stated that she had been sober since May of 2014. [R. 533]. Dr. Renfrow indicated that there were "significant impairments" in the following areas: processing speed, visuospatial reasoning and detection, attention, impulsivity, fine motor agility, immediate and delayed memory, as well as severe depression and anxiety. [R. 517]. In the Emotional, Behavioral, and Personality Functioning section, Dr. Renfrow noted that, although Plaintiff appeared fearful, nervous, and exhibited physical symptoms of trembling, shaking, numbness, becoming flushed, and feeling wobbly in the legs, this was "interpreted with some caution due to a slight inconsistency in responding and an over-reporting of problems." [R. 532]. According to Dr. Renfrow, Plaintiff would have "significant difficulty learning and applying new skills, processing new information in a timely and accurate manner, recalling important details and working with hands-on or otherwise visual material (including reading, monetary tasks, writing)." *Id.* Further, the doctor stated that Plaintiff's cognitive functioning is likely worsened by her current state of depression and

13

anxiety, "as well as possible additive neuropsychological effects of long-term alcohol abuse." *Id.* Dr. Renfrow noted that Plaintiff's level of motivation, energy, concentration, interest, and perseverance were also probably impaired by her current emotional state. *Id.* She diagnosed Plaintiff with major neurocognitive disorder due to multiple etiologies; major depressive disorder, recurrent episode, severe; unspecified anxiety disorder; and alcohol use disorder, in early remission. [R. 533]. Dr. Renfrow recommended that Plaintiff obtain psychological and psychiatric services and pursue brain imaging to determine to what extent neurological damage to her brain may have occurred as a result of long-term alcohol use. *Id.* The doctor concluded that Plaintiff would likely have great difficulty establishing and maintaining employment. *Id.*

Carol Witschel submitted a Declaration in support of Plaintiff's disability benefits on July 14, 2015, in which she reiterated Plaintiff's long-term alcohol abuse. [R. 310-312]. According to Ms. Witschel, Plaintiff has been an alcoholic since the 1990's and has gotten progressively worse. [R. 310]. Ms. Witschel stated that Plaintiff's testimony at the December 3, 2014, hearing in front of the ALJ was false when Plaintiff claimed that she had been sober for six months. *Id.* Ms. Witschel claims that Plaintiff has not been sober since she left rehab in May of 2014, and that Plaintiff's drinking has resumed and is occurring more frequently. *Id.* Ms. Witschel also claims that Plaintiff is "embarrassed to truthfully reveal to her regular doctors the extent of her mental and physical distress." [R. 311].

## C. ALJ Decision

The ALJ issued his decision on Plaintiff's claim for benefits on May 15, 2015. [R. 14-29]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 17-19]. He found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in

14

substantial gainful activity since June 15, 2012, the alleged on-set date. [R. 19]. The ALJ then found that Plaintiff suffers from the following severe impairments: status post cerebrovascular accident, tachycardia, and alcohol abuse. *Id.* The ALJ explicitly stated that these physical impairments "more than minimally limit [Plaintiff's] ability to perform basic work activities and therefore are severe." *Id.*

Further, the ALJ stated that Plaintiff's medically determinable mental impairments of major depressive disorder and unspecified anxiety disorder, "considered singly and in combination, do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere." *Id.* The ALJ then evaluated the four functional areas of the "paragraph B" criteria. *Id.* The ALJ concluded that "[b]ecause [Plaintiff's] medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere." [R. 20].

The ALJ noted that there is no evidence in the record of Plaintiff seeking mental health treatment for her depression and Plaintiff admitted that the Trazodone she takes is effective for her depression. *Id.* Therefore, the ALJ determined that he would give little weight to the evidence submitted post-hearing, which diagnosed Plaintiff with mental impairments and recommended that Plaintiff not seek employment due to severe emotional and neurocognitive impairments, because it was not supported by the record as a whole. *Id.* The ALJ gave great weight to the portion of the opinion of the State agency psychological consultant concluding that Plaintiff did not have a severe mental impairment. *Id.*

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

CFR Part 404, Subpart P, Appendix 1. *Id.* According to the ALJ, Plaintiff's tachycardia does not meet the criteria of listing 4.05 "because she does not have recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled, recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope." [R. 21]. The ALJ stated that that the record does not show that Plaintiff has had any sensory or motor aphasia but does show that Plaintiff has a stable gait and is neurologically stable. *Id.*

The ALJ then completed a residual functional capacity ("RFC") assessment and found that Plaintiff has the residual functional capacity to perform "sedentary work as defined in 20 CFR 404.1567(a), except she can frequently handle with the right hand and should not climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards such as unprotected heights and dangerous machinery." *Id.* The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.*

The ALJ then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. [R. 21-22]. The ALJ went through Plaintiff's testimony at the hearing and the various medical records in detail. [R. 22-23]. The ALJ found that "the claimant's medically determinable

16

impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [R. 22]. He specifically found that in terms of Plaintiff's alleged impairments, "she had a stable gait, full motor function strength, and has been described as neurologically stable," and had "a normal ejection fraction and confirmation that her PFO closure device was functioning normally." *Id.* Moreover, the ALJ noted that Plaintiff did not stop working due to any of her alleged impairments but because her job was outsourced to India. *Id.*

In terms of the opinion evidence, the ALJ explained that "little weight is given to the opinion of the State agency medical consultant, who opined [Plaintiff] could perform light work, as it is inconsistent with the evidence described above that showed [Plaintiff] to have tachycardia and some problems with her right side."[8] [R. 23]. Further, the ALJ "gave great deference to [Plaintiff's] testimony at the hearing regarding the weight she could lift and her ability to sit for fairly long periods and her other complaints in limiting her to sedentary work." *Id.* However, the ALJ did not give significant weight to the opinions of "other sources," including Plaintiff's former employer, Plaintiff's friend, Plaintiff's daughter, and Plaintiff's retirement account manager, because their opinions were not consistent with the preponderance of the opinions and observations by medical doctors in this case. *Id.* In sum, the ALJ concluded that his residual functional capacity assessment was supported by the objective medical evidence of record and Plaintiff's testimony. *Id.*

Next, the ALJ concluded that Plaintiff was capable of performing past relevant work as a

---

[8] Although the ALJ gave little weight to the portion of the State consultant's opinion which opined that Plaintiff could perform light work, the ALJ gave great weight to the portion of the State consultant's opinion which concluded that Plaintiff did not have a severe mental impairment, as noted earlier.

nurse consultant. *Id.* Finally, he found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 15, 2012, through the date of this decision." [R. 24].

### D. Additional Evidence Submitted to Appeals Council and Appeal's Council Decision

Subsequent to the hearing in front of the ALJ, Plaintiff's attorney sent correspondence to the Appeals Council stating that Plaintiff's "condition has not materially improved" and added to the record "a letter from [Plaintiff's] regular treating physician, Dr. Egitto, that further supports her disability claim." [R. 8]. The letter was from Dr. Egitto and dated November 30, 2015, claiming that Plaintiff was "currently suffering from shortness of breath, severe fatigue, and palpitations" and would need to "remain out of work and will be re-evaluated in 4-6 weeks." [R. 9].

On May 4, 2016, the Appeals Council denied Plaintiff's request for review because it found no reason under the rules to review the ALJ's decision and because the letter submitted by Dr. Egitto after the ALJ hearing concerned a date after May 15, 2015, which was when the ALJ decided the case. [R. 2]. Plaintiff does not appear to contest the Appeals Council's denial of review.

## II.   **MOTIONS FOR SUMMARY JUDGMENT**

In her Motion for Summary Judgment and Memorandum of Law, Plaintiff makes two main arguments. [DE 17]. First, she argues that the ALJ erred because his decision was not supported by substantial evidence and he misapplied the social security law. [DE 17, p. 4]. Specifically, Plaintiff contends that the ALJ "failed to properly evaluate the combined and cumulative effect of [Plaintiff's] impairments" and "failed to fully compare [Plaintiff's]

medically determinable impairments to the pertinent listing of impairments." [DE 17 pp. 4-18]. Plaintiff claims that the ALJ improperly gave the opinion of the State agency psychologist great weight. [DE 17, p. 10]. Plaintiff also claims that the ALJ did not consider all the evidence submitted by Plaintiff's family members and former boss properly. [DE 17, pp. 12-14]. Next, Plaintiff asserts that the ALJ's analysis of [Plaintiff's] residual functional capacity lacks substantial evidence and contradicts the Government's own [vocational] expert." [DE 17, pp. 18-19].

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment, she first argues that the ALJ properly considered the combined effect of Plaintiff's impairments. [DE 18, pp. 7-9]. Defendant next asserts that substantial evidence supports the ALJ's finding that Plaintiff's impairments do not meet or equal a listed impairment. [DE 18, pp. 9-17]. Finally, Defendant maintains that the ALJ properly relied on the testimony of the vocational expert. [DE 18, pp. 17-19].

In her Reply [DE 20], Plaintiff claims that the ALJ failed to consider "that a significant part of [Plaintiff's] illness and disability is her inability and refusal to admit or accurately discuss her combined physical and mental problems, or their impact, and seek consistent treatment." [DE 20, p. 2]. According to Plaintiff, the Commissioner and the ALJ gave misleading recitations of the facts. [DE 20, pp. 2-5]. Plaintiff also re-asserts her argument that the ALJ did not analyze Plaintiff's combination of physical and mental impairments and "properly" compare them to the severity of the impairments in the Listings. [DE 20, pp. 5-7]. Plaintiff alleges that the ALJ improperly rejected the lay opinions of Plaintiff's family and former boss and the "results of detailed psychological, emotional, behavioral and personality testing." [DE

19

20, pp. 7-10]. Plaintiff argues that the ALJ's decision to accord great weight to the State psychologist's opinion was error. [DE 20, pp. 10-11]. Finally, Plaintiff claims that the ALJ and Commissioner ignored the vocational expert's testimony. [DE 20, pp. 11-13].

## III. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is

made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

### A. Whether the ALJ failed to properly evaluate the combined and cumulative effect of Plaintiff's severe impairments

An ALJ is required at step two of the analysis to determine whether the claimant's impairments are severe or not severe. 20 C.F.R. § 404.1520(a)(4)(ii). "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild." *McDaniel v. Bowen*, 800 F. 2d 1026, 1031 (11th Cir. 1986). The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Brown*, 814 F. 2d 585, 588 (11th Cir. 1987). As the ALJ continues to steps three, four, and five of the required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Soc. Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 2013) (citing *Jamison*, 814 F.2d at 588).

Plaintiff contends that, at step two of the evaluation process, the ALJ erred by "segregating what he (incorrectly) regarded as [Plaintiff's] medically determinable 'mental impairments' of major depressive disorder and unspecified anxiety disorder, and analyzing their severity independent from those impairments he had found to be severe—post-stroke, tachycardia and alcohol abuse disorder." [DE 17, p. 5]. She argues that the ALJ "did not attempt to determine whether the combination and cumulative effects of [Plaintiff's] impairments meet or medically equal the severity of one of the listed impairments." [DE 17, p. 6].

22

According to Defendant, substantial evidence supports the ALJ's finding that Plaintiff's depression and anxiety were not severe impairments because they do not cause more than mild limitation in Plaintiff's ability to perform mental work activities. [DE 18, pp. 7-8]. Defendant argues that the only treatment Plaintiff receives for her depression is medication (Trazodone), which is effective, and the record does not support Plaintiff's allegations that her anxiety and depression cause more than mild limitation. [DE 18, pp. 8-9]. Finally, Defendant maintains that the ALJ's finding that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments is enough to evidence the ALJ's consideration of the combined effects of a claimant's alleged impairments at step two of the evaluation process. [DE 18, p. 9].

"The finding of any severe impairment, based on either a single impairment or a combination of impairments, is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r of Soc. Sec. Admin.*, 420 Fed. Appx. 901, 902 (11th Cir. 2011). When the ALJ makes "a clear statement that the ALJ considered the combination of impairments," then he has made an adequate expression of his findings. *Id.*

At step two of the required analysis, the ALJ found that Plaintiff suffers from the following severe impairments: status post-cerebrovascular accident, tachycardia, and alcohol abuse. [R. 19]. The ALJ then went through Plaintiff's mental impairments of major depressive disorder and unspecified anxiety disorder and concluded that they were nonsevere. *Id.* He stated that he "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders," known as the "paragraph B" criteria. *Id.* The

ALJ determined that Plaintiff has mild limitation in activities of daily living, mild limitation in social functioning, mild limitation in concentration, persistence, or pace, and no episodes of decompensation which have been of extended duration. [R. 20]. The ALJ concluded that Plaintiff's medically determinable mental impairments were nonsevere pursuant to 20 CFR § 404.1520a(d)(1). *Id.* Finally, the ALJ explicitly stated that his "residual functional capacity assessment reflects the degree of limitation [he] found in the 'paragraph B' mental functional analysis." *Id.*

Therefore, the ALJ's conclusion at step two of the evaluation process was sufficient because he found that Plaintiff had three severe impairments and because he clearly stated that his residual functional capacity assessment reflected his conclusions in regard to Plaintiff's mental impairments.

### B. Whether the ALJ erred in giving great weight to the portion of the opinion of the State agency psychological consultant concluding that Plaintiff's mental impairments were not severe

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F. 3d 1436, 1440 (11th Cir. 1997). "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F. 3d 1232, 1241 (11th Cir. 2004). If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

Plaintiff claims that the State agency psychological consultant, Dr. Christner-Renfroe's opinion that Plaintiff's mental impairments were nonsevere should have been given little weight because it was contrary to the opinion of the doctors who actually examined Plaintiff and

24

because the State consultant did not actually examine Plaintiff or examine the record as a whole. [DE 17, p. 10; DE 20, pp. 6-7]. According to Plaintiff, Dr. Renfrow, the psychologist that Plaintiff saw after the ALJ hearing, was not a one-time examiner, as alleged by Defendant. [DE 20, p. 10]. Further, Plaintiff argues that "[t]he Commissioner, like the ALJ and several of [Plaintiff's] treating physicians, paid little attention to the unarticulated symptoms of her mental impairments." *Id.* Plaintiff contends that once she got sober, her mental impairments were finally able to be measured by Dr. Renfrow, which evidence was consistent with the opinions of Plaintiff's family members and others. [DE 20, p. 11].

Defendant asserts that Dr. Renfrow[9] was a one-time examining neuropsychologist and that the ALJ properly evaluated her opinion. [DE 18, p. 14]. According to Defendant, the opinion of a one-time examiner is not entitled to great weight. *Id.* Defendant further claims that the ALJ may reject any medical opinion if the evidence supports a contrary finding and the ALJ articulates the reasons he assigns certain weight to medical opinions. *Id.* Defendant alleges that the ALJ "considered Dr. [Renfrow]'s opinion, weighed it, and explained his reason for giving it little weight." *Id.* Defendant argues that Dr. Renfrow's opinion was inconsistent with the record evidence and the State consultant's opinion was consistent with the record evidence. [DE 18, pp. 14-15]. Defendant contends that, although the State consultant did not consider certain evidence, the ALJ did consider all the evidence, which was consistent with the opinion of the State consultant. [DE 18, p. 15].

The ALJ specifically explained in his decision that Plaintiff has not had "any in-patient psychiatric hospitalizations or any other periods of decompensation." [R. 20]. The ALJ also

---

[9] Although Defendant claims that "Dr. Fetscher" was the one that examined Plaintiff in this consultation, it appears from the letter that Dr. Renfrow was the one who consulted with Plaintiff. This confusion likely occurred because "Dr. Taryn Fetscher, Psychometrician" and Dr. Renfrow both signed the Neuropsychological Evaluation of Plaintiff. The Court will refer to this Evaluation as done solely by Dr. Renfrow for consistency in this Order.

noted that Plaintiff did not seek any mental health treatment and Plaintiff admitted that her medication, Trazodone, was effective for her depression. *Id.* Further, the ALJ stated that the record indicated that Plaintiff "has had a euthymic mood and appropriate affect." *Id.* Therefore, the ALJ gave the post-hearing evidence and opinion of Dr. Renfrow, which diagnosed Plaintiff with mental impairments and recommended that Plaintiff not seek employment due to severe emotional and neurocognitive impairments, little weight because it was not supported by the record as a whole. *Id.* The ALJ gave the opinion of the State agency psychological consultant, who opined that Plaintiff did not have a severe mental impairment, great weight because it was consistent with the evidence. *Id.*

According to the medical evidence, Plaintiff has complained of depression and anxiety, albeit inconsistently, and has been prescribed medication. [R. 80-92, 303, 515-25]. On September 12, 2013, Dr. Trina Christner completed a Disability Determination Explanation—Reconsideration of Plaintiff. [R. 80-92]. Plaintiff admitted to Dr. Christner that she had an alcohol problem. [R. 81]. Dr. Christner concluded that, in addition to CVA (late effects of cerebrovascular disease), Plaintiff also suffered from anxiety disorders, which were nonsevere. [R. 87]. Dr. Christner found that, under the "paragraph B" criteria of the listings, Plaintiff's anxiety disorders mildly restrict her activities of daily living, cause Plaintiff to have mild difficulty with social functioning, cause Plaintiff to have mild difficulty in maintaining concentration, persistence or pace, and do not cause Plaintiff to have any repeated episodes of decompensation of extended duration. [R. 88]. Dr. Christner noted that, although Plaintiff claims that she has depression and was treated with a low dose of Klonopin, Plaintiff's symptoms had not prompted a referral to a psychiatrist and she was not diagnosed with depression. *Id.* Further, Dr. Christner stated that Plaintiff had not mentioned her allegations

of anxious behavior to her physical treating sources, nor her neurologist, Dr. Schallop. *Id.* Dr. Christner found that Plaintiff was not disabled. [R. 92].

The ALJ gave the opinion of Dr. Christner, the State agency consultant, great weight because it was consistent with the evidence. [R. 20]. Plaintiff argues that this was error, in part, because the State agency consultant did not mention that Plaintiff saw a psychiatrist, Dr. Philip Scharfer, M.D. in July of 2013 for depression and anxiety. [DE 17, p. 9]. Dr. Scharfer's "opinion" consists of one page of handwritten notes, which states that Plaintiff presented to Dr. Scharfer for "depression secondary to physical problems" and appears to diagnose Plaintiff with dysthymic disorder. [R. 303]. However, the record indicates that Plaintiff cancelled her two next appointments with Dr. Scharfer and did not show for another appointment. *Id.* Further, at the hearing in front of the ALJ, Plaintiff stated that she had not been to a psychologist for her depression and saw a psychiatrist once but she thought he "didn't have anything to offer [her]" so she stopped going to him. [R. 55]. Of important note, Dr. Scharfer's opinion was not submitted and made a part of the record until Plaintiff's attorney filed a letter with the Court on November 17, 2014, attaching Dr. Scharfer's handwritten notes as an Exhibit to the letter. [R. 288-309]. This was after the State agency consultant completed her Disability Determination on September 12, 2013. Therefore, the State agency consultant could not have possibly taken into account the fact that Plaintiff had seen Dr. Shcarfer and factored that into her analysis.

On December 18 and 19, 2014, after the hearing in front of the ALJ, Plaintiff presented to Dr. Renfrow, a clinical psychologist, to discuss Plaintiff's current level of psychological and cognitive functioning. [R. 526-34]. Dr. Renfrow submitted a letter to the ALJ memorializing her findings in the consultation. [R. 515-25]. During the consultation, Plaintiff complained of

27

"memory loss and severe emotional distress," but stated that she had been sober since May of 2014. [R. 533]. Dr. Renfrow indicated that there were "significant impairments" in the following areas: processing speed, visuospatial reasoning and detection, attention, impulsivity, fine motor agility, immediate and delayed memory, as well as severe depression and anxiety. [R. 517]. In the Emotional, Behavioral, and Personality Functioning section, Dr. Renfrow noted that, although Plaintiff appeared fearful, nervous, and exhibited physical symptoms of trembling, shaking, numbness, becoming flushed, and feeling wobbly in the legs, this was "interpreted with some caution due to a slight inconsistency in responding and an over-reporting of problems." [R. 532]. According to Dr. Renfrow, Plaintiff would have "significant difficulty learning and applying new skills, processing new information in a timely and accurate manner, recalling important details and working with hands-on or otherwise visual material (including reading, monetary tasks, writing)." *Id.* Further, the doctor stated that Plaintiff's cognitive functioning is likely worsened by her current state of depression and anxiety, "as well as possible additive neuropsychological effects of long-term alcohol abuse." *Id.* Dr. Renfrow noted that Plaintiff's level of motivation, energy, concentration, interest, and perseverance were also probably impaired by her current emotional state. *Id.* She diagnosed Plaintiff with major neurocognitive disorder due to multiple etiologies; major depressive disorder, recurrent episode, severe; unspecified anxiety disorder; and alcohol use disorder, in early remission. [R. 533]. Dr. Renfrow recommended that Plaintiff obtain psychological and psychiatric services and pursue brain imaging to determine to what extent neurological damage to her brain may have occurred as a result of long-term alcohol use. *Id.* The doctor concluded that Plaintiff would likely have great difficulty establishing and maintaining employment. *Id.*

The Court finds that the ALJ's conclusion according great weight to the State agency

consultant, Dr. Christner-Renfroe's opinion that Plaintiff's mental impairments were nonsevere was supported by substantial evidence for multiple reasons. First, the ALJ articulated adequate reasons for discounting Dr. Renfrow's opinion. [R. 20]. The ALJ explained that Dr. Renfrow's consultation with Plaintiff, completed and submitted post-hearing, diagnosed Plaintiff with mental impairments and recommended that Plaintiff not seek employment "due to severe emotional and neuro-cognitive impairments." *Id.* However, the ALJ noted that these limitations were not supported by the record as a whole. *Id.* The medical evidence, the ALJ stated, indicated that Plaintiff had a euthymic mood and appropriate effect. *Id.* The record also showed that Plaintiff's medication for depression was effective and there was no evidence of Plaintiff seeking mental health treatment besides a one-time visit to Dr. Scharfer. *Id.* Thus, the ALJ articulated adequate reasons in his decision for discounting the opinion of Dr. Renfrow.

Second, there was good cause for the ALJ to not give substantial or considerable weight to Dr. Renfrow's opinion. *Phillips*, 357 F. 3d at 1241. As Plaintiff herself stated, Plaintiff has an "inability and refusal to admit or accurately discuss her combined physical and mental problems, or their impact, and seek consistent treatment." [DE 20, p. 2]. Plaintiff noted that she "downplays, and for years denied, her alcohol abuse, and attendant cognitive and psychological impairments." *Id.* This is a case where Plaintiff inconsistently admitted to abusing alcohol to some physicians and denied abusing alcohol to others. The fact that Plaintiff was not straight-forward and candid with her treating physicians can at least partially explain their different findings regarding Plaintiff's mental health. Because of Plaintiff's refusal to discuss her mental impairments, the record is inconsistent and does not support Dr. Renfrow's finding that Plaintiff should not seek employment due to severe emotional and neurocognitive impairments.

Moreover, Dr. Renfrow examined Plaintiff one time, although it was over a course of two days. One-time examiners are not considered treating physicians and their opinions are not entitled to deference. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). Therefore, the ALJ was not required to give Dr. Renfrow's opinion substantial or considerable weight.

Third, the State consultant, Dr. Christner-Renfroe's opinion was supported by the record evidence. The opinion of a State agency consultant may be entitled to great weight if the opinion is supported by the evidence in the record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158, 1160 (11th Cir. 2004). The State consultant, Dr. Christner, concluded that, in addition to CVA (late effects of cerebrovascular disease), Plaintiff also suffered from anxiety disorders, which were nonsevere. [R. 87]. Dr. Christner found that Plaintiff was not disabled. [R. 92]. Therefore, the State consultant did consider Plaintiff's mental impairments but found that they were nonsevere. This opinion is consistent with the record and supported by the record evidence as a whole because there was not substantial evidence showing that Plaintiff's mental impairments were severe. Plaintiff herself stated that she had not undergone any therapy and that the psychiatrist she saw "didn't have anything to offer." [R. 34; 55]. Although Plaintiff was prescribed Klonopin, Dr. Schallop stated in his notes that this prescription was for Plaintiff's right leg cramping. [R. 338]. Further, Plaintiff stated that the medication she takes for her depression, Trazodone, was effective. [R. 39; 73].

The record evidence, therefore, shows that Plaintiff's medication at least moderately improves, if not completely improves, her depression. Further, the record evidence does not show that Plaintiff sought consistent, serious medical help for her depression and anxiety. Based on this evidence, the ALJ concluded that he would give little weight to Dr. Renfrow's opinion and give great weight to the opinion of the State agency psychological consultant. [R.

20]. The Court finds that the ALJ's conclusion was supported by substantial evidence.

C. Whether the ALJ failed to fully compare Plaintiff's medically determinable impairments to the pertinent Listing of Impairments

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the Listing of Impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. At step three of the required analysis, the ALJ explicitly stated that Plaintiff "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." [R. 20]. "While the ALJ is required to consider the Listing of Impairments in making a decision at step three, we do not require an ALJ to 'mechanically recite' the evidence or listings [he or] she has considered." *Flemming v. Comm'r of Soc. Sec. Admin.*, 635 Fed.Appx. 673, 676 (11th Cir. 2015).

Plaintiff carries the burden of proof to show that her impairments meet or medically equal a listed impairment. *Bellew v. Acting Comm'r of Soc. Sec.*, 605 Fed.Appx. 917, 920 (11th Cir. 2015). "To meet the requirements of a Listing, the claimant must have a diagnosis included in the Listing and must provide medical reports documenting that the condition meets the Listing's specific criteria and duration requirement. An impairment—no matter how severe—that meets only some of the Listing requirements does not qualify." *Id.* (citations omitted). An ALJ's finding as to whether a claimant does or does not meet a listed impairment may be implied from the record and does not need to be explicit in his or her decision. *Id.*

Plaintiff claims that the ALJ did not conduct a complete analysis at step three of the evaluation process because he "made no attempt to compare [Plaintiff's] substance addiction disorder and status post-stroke...to the Appendix 1 listings, in particular, Appendix 1, 12.09,

12.02, and 12.04." [DE 17, p. 6]. Plaintiff argues that the ALJ only considered Plaintiff's post-stroke condition as a physical neurological disorder but failed to consider and analyze Plaintiff's substance abuse as a mental impairment. [DE 17, pp. 6-7]. Further, Plaintiff asserts that the ALJ "failed to evaluate the severity of [Plaintiff's] post-stroke impairments as a traumatic brain injury, and conduct the analysis for Organic Mental Disorders." [DE 17, p. 7].

Defendant contends that "the ALJ correctly applied the legal standards in finding that Plaintiff's impairments or combination of impairments did not meet or equal a listed impairment." [DE 18, p. 9]. According to Defendant, although the ALJ did not specifically mention the Listings argued by Plaintiff, he did evaluate whether Plaintiff exhibited "Paragraph B" criteria for Listings 12.02 and 12.04. [DE 18, p. 10]. Because Plaintiff did not have marked limitations in "Paragraph B" domains, Defendant claims that the ALJ could not have found that Plaintiff's impairments met the other Listings at issue. [DE 18, pp. 10-11].

Because Plaintiff alleges that the ALJ failed to evaluate whether Plaintiff met Listing 12.02 for organic mental disorders, Listing 12.04 for affective disorders, Listing 12.06 for anxiety disorders, and Listing 12.09 for substance abuse disorders, the specific Listings will be discussed in a more detailed, logical way in the subheadings below.

1. **Whether the ALJ's conclusion with regard to the Paragraph B requirements is supported by substantial evidence**

In order to meet the Listing of 12.02, 12.04, or 12.06, Plaintiff must show that she meets the requirements of "Paragraph A" and "Paragraph B," or that she meets the requirements of "Paragraph C." *Bellew*, 605 Fed.Appx. at 923-24. In order to meet the "Paragraph B" requirements, Plaintiff must show at least two of the following: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked

difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* at 924.

The ALJ went through Plaintiff's mental impairments of major depressive disorder and unspecified anxiety disorder and concluded that they were nonsevere. [R. 19-20]. The ALJ concluded that Plaintiff's "medically determinable mental impairments of major depressive disorder and unspecified anxiety disorder, considered singly and in combination, do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere." [R. 19]. He stated that he "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in Section 12.00C of the Listings of Impairments," known as the "paragraph B" criteria. *Id.*

First, the ALJ discussed Plaintiff's activities of daily living, and noted Plaintiff's hearing testimony that she "prepares meals, does laundry occasionally with encouragement, drives a car, and shops in stores and by computer." [R. 20]. The ALJ concluded that Plaintiff has mild limitation in this area. *Id.*

At the hearing, Plaintiff testified that she rinses off dishes and puts them in the dishwasher, pays her bills over the phone, does laundry, takes out the trash, goes grocery shopping, drives to Alcoholics Anonymous meetings, and takes care of her cat. [R. 43]. Plaintiff's testimony, and the record as a whole, supports the ALJ's finding that Plaintiff had only mild limitation in her activities of daily living.

Second, in the area of social functioning, the ALJ stated that Plaintiff "reported that she engages in almost no social activities…[but] spends time with others by talking on the phone daily and visiting in person." [R. 20]. The ALJ concluded that Plaintiff had mild limitation in the area of social functioning. *Id.*

33

Although Plaintiff asserts that she participates in no social activities, Plaintiff listed talking on the telephone as a daily activity on her Function Report and stated that she also visits in person with people if they come to her house. [R. 252, 255]. Again, Plaintiff's testimony and the record as a whole support the ALJ's finding that Plaintiff only had mild limitation in this area.

Third, with regard to concentration, persistence or pace, the ALJ noted that Plaintiff reported problems with memory, completing tasks, and concentration. However, the ALJ also noted the Plaintiff was "able to do things like drive a car, pay bills, count change, handle a savings account, and use a checkbook and money orders." [R. 20]. The ALJ found that Plaintiff has mild limitation in this area. *Id.*

Although Plaintiff reported problems with concentration to Dr. Renfrow in her consultation, there was no evidence from her treating physicians that Plaintiff had any problems with concentration, persistence, or pace. This may be due to the fact that Plaintiff represented to her treating physicians that she was still working full time when she had allegedly stopped working. [DE 20, p. 2]. However, as noted earlier, it is Plaintiff's burden to show that she meets any of the "Paragraph B" criteria. *Bellew*, 605 Fed.Appx. at 924. Because there is no evidence that Plaintiff had more than mild limitation in concentration, persistence or pace, the ALJ's finding is supported by Plaintiff's testimony, the medical records, and the record as a whole.

Fourth, the ALJ discussed episodes of decompensation and stated that Plaintiff had no episodes of decompensation which have been of extended duration. Further, according to the ALJ, the "record does not indicate [Plaintiff] has had any in-patient psychiatric hospitalizations or any other periods of decompensation." *Id.* Plaintiff admits that this area does not apply to

34

her.  [DE 17, p. 11].

Accordingly, the ALJ concluded that Plaintiff did not meet the "Paragraph B" criteria and that her medically determinable mental impairments were nonsevere pursuant to 20 CFR § 404.1520a(d)(1).  *Id.*

The ALJ also noted that Plaintiff did not seek any mental health treatment and that she admitted that her medication, Trazodone, was effective for her depression.  *Id.*  Further, the ALJ stated that the record indicated that Plaintiff "has had a euthymic mood and appropriate affect."  *Id.*  Finally, the ALJ explicitly stated that his "residual functional capacity assessment reflects the degree of limitation [he] found in the 'Paragraph B' mental functional analysis."  *Id.*

Based on the evidence and Plaintiff's own testimony, the ALJ concluded that Plaintiff's mental impairments did not meet the "Paragraph B" criteria of the Listing of Impairments and were nonsevere.  [R. 20].  Substantial evidence supports that determination.  Specifically, the record supports the ALJ's findings that Plaintiff did not seek any mental health treatment.

At the hearing in front of the ALJ, Plaintiff's counsel herself stated that Plaintiff "has not underwent [sic] any kind of therapy, either physical or psychological or vocational, and that between depression and the effects of her stroke and her alcohol abuse."  [R. 34].  Contrary to this assertion, in her Motion for Summary Judgment, Plaintiff argues that Plaintiff consulted a psychiatrist, Dr. Philip Scharfer, M.D. in July of 2013 for depression and anxiety.  [DE 17, p. 9].  This consultation consists of one page of handwritten notes, which states that Plaintiff presented to Dr. Scharfer for "depression secondary to physical problems" and appears to diagnose Plaintiff with dysthymic disorder.  [R. 303].  However, the record indicates that Plaintiff cancelled her next two appointments with Dr. Scharfer and did not show for another appointment.  *Id.*  At the hearing, Plaintiff stated that she had not been to a psychologist for

her depression and saw a psychiatrist once but she thought he "didn't have anything to offer [her]" so she stopped going to him.   [R. 55].

Furthermore, in her consultation with Plaintiff, Dr. Renfrow noted that although Plaintiff appeared fearful, nervous, and exhibited physical symptoms of trembling, shaking, numbness, becoming flushed, and feeling wobbly in the legs, this was "interpreted with some caution due to a slight inconsistency in responding and an over-reporting of problems."   [R. 532].

The record also supports the ALJ's finding that Plaintiff's medication was effective for her depression.   In Plaintiff's Disability Determination Explanation, dated May 9, 2013, Plaintiff advised that Trazodone improved her depression and her physical condition.   [R. 73]. Further, at the hearing, Plaintiff testified that she takes Trazodone "for depression and to help [her] try to sleep at night."   [R. 39].   Plaintiff stated that the Trazodone helps her depression but does not keep her asleep at night.   *Id.*

Moreover, Plaintiff was advised by Dr. Villa to quit smoking, avoid stimulants like caffeine and alcohol, and monitor her blood pressure and heart rate twice a day.   [R. 470]. Plaintiff did not seem to exhibit depressive behavior or anxiety when she was in compliance with her treatment program and when she was not self-medicating with alcohol.   *Id.*; [R. 502-14]; *Flemming,* 635 Fed.App.x at 677.   Plaintiff checked into an alcohol treatment facility in April of 2014; however, in May of 2014, Plaintiff left alcohol treatment against the advice of others and apparently began self-medicating with alcohol again when she returned home.[10]   [R.

---

[10] The Court is somewhat concerned with Plaintiff's counsel's inconsistent representations to the Court about whether Plaintiff is sober or still abusing alcohol.   In Plaintiff's counsel's Declaration dated July 14, 2015, counsel stated that Plaintiff's testimony at the ALJ hearing that she had been sober since May of 2014 "was not truthful; [because Plaintiff] had cut back significantly on her drinking, but she was not sober for 6, or any, months.   Perhaps more importantly, since that time, [Plaintiff] has resumed drinking to excess more frequently and without control." [R. 310].   However, in Plaintiff's Motion for Summary Judgment, counsel states that Plaintiff underwent neuropsychological testing "after six months of sobriety."   [DE 17, p. 17].   This testing was done on December 18

293-94]; *see* 20 C.F.R. § 416.930 (stating that a refusal to follow prescribed medical treatment without good reason will preclude a finding of disability).

Finally, Plaintiff did not state at the hearing that she stopped working because of any of her mental impairments. In fact, Plaintiff alleged at the hearing that she stopped working because her work was being outsourced to India, not because of her depression, anxiety, or any other impairment. [R. 37].

In conclusion, the ALJ's finding that Plaintiff did not meet the "Paragraph B" criteria of the Listing of Impairments was supported by substantial evidence.

## 2. Whether the ALJ erred in failing to conduct any analysis of the Paragraph A severity requirements in the Listing of Impairments

Listing 12.02 applies to organic mental disorders. In order to meet the Listing of 12.02, Plaintiff must show that she meets the requirements of "Paragraph A" and "Paragraph B," or that she meets the requirements of "Paragraph C." *Bellew*, 605 Fed.Appx. at 923-24.

As noted earlier, the ALJ stated that he "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments," known as the "Paragraph B" criteria, and determined that Plaintiff had mild limitation in activities of daily living, mild limitation in social functioning, mild limitation in concentration, persistence, or pace, and no episodes of decompensation which have been of extended duration. [R. 19-20]. This conclusion was based on substantial evidence.

Moreover, the "Paragraph C" criterion of Listing 12.02 requires:

a medically documented history of the alleged mental disorder "of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication

---

and 19, 2014. [R. 527]. Therefore, Plaintiff's counsel's representation to this Court that Plaintiff is "sober" has been inconsistent.

or psychosocial support," as well as one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in "such marginal adjustment" that it is predicted that "even a minimal increase in mental demands or change in the environment" would cause decompensation; or (3) a current history of at least one year's "inability to function outside a highly supportive living arrangement," with an indication that this arrangement needs to continue.

*Bellew*, 605 Fed.Appx. at 924. The ALJ did not make a determination as to the "Paragraph C" criteria. However, Plaintiff did not have any evidence of episodes of decompensation of extended duration, a residual disease process, or a history of at least one year's inability to function outside a highly supportive living arrangement. Plaintiff testified at the hearing that she frequently leaves her house and drives herself to the store and Alcoholics Anonymous meetings. [R. 35, 45].

Therefore, because Plaintiff did not meet at least two requirements of the "Paragraph B" criteria for Listing 12.02, and did not meet the requirements of the "Paragraph C" criteria, the ALJ did not need to discuss the "Paragraph A" criteria for Listing 12.02. *See Himes v. Comm'r of Soc. Sec.*, 585 Fed.Appx. 758, 763 (11th Cir. 2014).

As for Listing 12.04, which applies to affective disorders, and Listing 12.06, which applies to anxiety-related disorders, they contain the same "Paragraph B" requirements as Listing 12.02. Therefore, the same analysis discussed above applies for these Listings as well. Again, because Plaintiff did not meet the "Paragraph B" criteria for Listing 12.04 or Listing 12.06, the ALJ did not need to discuss the "Paragraph A" criteria for Listings 12.04 or 12.06.

The "Paragraph C" criteria for Listing 12.04 is also the same as that for Listing 12.02. Therefore, the analysis above for the "Paragraph C" criteria for Listing 12.02 is the same as for Listing 12.04.

Further, the "Paragraph C" criteria of Listing 12.06 "requires that the claimant's

impairment results in a complete inability to function outside the area of [his or] her home."
*Bellew*, 605 Fed.Appx. at 924.   The ALJ did not make a determination as to the "Paragraph C"
criteria.   However, as Plaintiff clearly testified at the hearing that she frequently leaves the
house and drives, she did not meet the "Paragraph C" criteria of Listing 12.06.   [R. 35-36].

In conclusion, the ALJ did not err when he declined to discuss the "Paragraph A" criteria
of the Listing of Impairments because Plaintiff did not meet the "Paragraph B" criteria of any of
the Listings.   Although the ALJ did not discuss the "Paragraph C" criteria, the record shows
that Plaintiff also did not meet the "Paragraph C" criteria of any of the Listings of Impairments.

### 3.  Whether the ALJ erred in failing to consider Plaintiff's substance abuse as a mental impairment

"Listing 12.09, which pertains to substance addiction disorders, is structured as a
reference listing and only serves to indicate which of the other listed impairments 'must be used
to evaluate the behavioral or physical changes resulting from regular use of addictive
substances." *Bellew*, 605 Fed.Appx. at 924-25; 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§
12.00(A), 12.09.   In other words, if the ALJ finds at step three that a claimant is disabled, and
there is medical evidence of alcoholism, then the ALJ must determine whether the alcoholism
was a "material contributing factor to the disability determination." *McMahon v. Comm'r of
Soc. Sec. Amdin.*, 583 Fed.Appx. 886, 888 (11th Cir. 2014).

However, at step three of the analysis, the ALJ concluded that Plaintiff did not have an
impairment or combination of impairments that meets or medically equals the severity of one of
the listed impairments.   [R. 20].   He found Plaintiff to not be disabled.   [R. 24].   This
conclusion was supported by substantial evidence.   Therefore, the ALJ did not need to
determine the effect of Plaintiff's alcohol abuse as a mental impairment.

Plaintiff claims "that a significant part of [Plaintiff's] illness and disability is her inability and refusal to admit or accurately discuss her combined physical and mental problems, or their impact, and seek consistent treatment." [DE 20, p. 2]. However, Plaintiff carries the heavy burden of proof to show that her impairments meet or medically equal a listed impairment. *Bellew*, 605 Fed.Appx. at 920. "To meet the requirements of a Listing, the claimant...must provide medical reports documenting that the condition meets the Listing's specific criteria and duration requirement." *Id.* (citations omitted). Although the Court recognizes the difficulty of Plaintiff downplaying her own impairments, without sufficient evidence, Plaintiff cannot meet her burden and show that she is disabled.

In conclusion, Plaintiff did not meet her burden of proving that her impairments satisfied the requirements of Listings 12.02, 12.04, 12.06, or 12.09. Plaintiff's impairments did not meet the "Paragraph B" criteria. Plaintiff provided no evidence showing that she had marked limitations in activities of daily living, maintaining social functioning, or maintaining concentration, persistence or pace. Moreover, even if the ALJ erred in determining the extent of Plaintiff's limitations in one of the aforementioned "Paragraph B" areas, any error was harmless because Plaintiff had to meet two of the four criteria in "Paragraph B." *Bellew*, 605 Fed.Appx. at 926. The ALJ sufficiently discussed Plaintiff's impairments and compared them to the Listing of Impairments in his decision.

### D. Whether the ALJ's analysis of Plaintiff's residual functional capacity was supported by substantial evidence

At step four of the process, the ALJ must determine whether a claimant can perform his or her past relevant work based on the RFC assessment. *See* 20 C.F.R. § 404.1520(a)(4)(iv). In the ALJ's RFC assessment, the ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these statements are not entirely credible...." [R. 22]. Therefore, the ALJ concluded that Plaintiff could perform her past relevant work as a nurse consultant. [R. 23].

Plaintiff contends that the ALJ's conclusion that Plaintiff has the residual functional capacity to perform her past work as a nurse consultant was not supported by substantial evidence. [DE 17, p. 18]. According to Plaintiff, the ALJ should not have credited Plaintiff's testimony at the hearing that she stopped working as a result of her work getting outsourced to India because that was a "pride-induced fabrication," and because, upon further questioning, Plaintiff "grudgingly admitted that the communication from her former employer...accurately described her working relationship and the progression of her deterioration." *Id.* Plaintiff contends that the ALJ erred by not giving more weight to the evidence from lay witnesses. [DE 17, pp. 13-14].

Defendant maintains that the ALJ properly considered Plaintiff's mental impairments in assessing her RFC when he discussed the lay opinions. [DE 18, p. 17]. According to Defendant, because the ALJ found that Plaintiff's mental impairments were not severe and gave them little weight, "he was not required to include mental limitations in the RFC finding." [DE 18, pp. 17-18].

The ALJ went through Plaintiff's medical records in detail. [R. 20-23]. The ALJ found that the severity of Plaintiff's mental impairments, considered both individually and in combination, do not meet or medically equal the criteria of section 12.00C of the Listing of Impairments. [R. 19]. He determined that the "Paragraph B" criteria were not met because Plaintiff only has mild limitation in activities of daily living, mild difficulties with social

functioning, mild difficulties with concentration, persistence, or pace, and has experienced no episodes of decompensation which have been of an extended duration. [R. 20]. The ALJ explained that his residual capacity assessment reflected the degree of limitation he had found in the "Paragraph B" mental function analysis. *Id.*

The ALJ then found that Plaintiff has the "residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can frequently handle with the right hand and should not climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards such as unprotected heights and dangerous machinery." [R. 21]. The ALJ discussed Plaintiff's allegations from her August 2013 Function Report and her testimony at the hearing. [R. 21-22].

Then, the ALJ explained that Plaintiff saw Dr. Schallop over the course of a few years. [R. 22]. The ALJ described Plaintiff's left basal ganglia infarction and right leg cramping, which she was on medication for and responding well. *Id.* He noted Plaintiff's tachycardia, which improved after Plaintiff was started on beta blockers by Dr. Villa. *Id.* The ALJ then discussed Plaintiff's treatment at Clarity Way and noted that Plaintiff had lower extremity edema, but stated that this improved after Plaintiff started elevating her legs and increasing her fluid intake. *Id.*

The ALJ concluded that "[i]n terms of [Plaintiff's] alleged symptoms related to her impairments, it is reasonable she would have some symptoms, but not of the severity alleged." *Id.* He stated that, although Plaintiff alleged significant limitations related to her ability to walk and use her right hand, the record evidence shows that Plaintiff "had a stable gait, full motor function strength, and has been described as neurologically stable." *Id.* Further, the ALJ noted that the record showed that Plaintiff had normal ejection fraction and her Patent Foramen

Ovale (PFO) closure device was functioning normally. *Id.* Therefore, the ALJ determined that Plaintiff's reasoning for not being able to work full time was only partially credible. *Id.* However, he still "gave great deference" to Plaintiff's testimony at the hearing regarding how much weight she should lift, her ability to sit for long periods of time, and other complaints. [R. 22-23].

The ALJ continued to the opinion evidence from Plaintiff's former employer, Plaintiff's friend, Plaintiff's daughter, and Plaintiff's retirement account manager and brother. [DE 23]. These lay opinions primarily discuss Plaintiff's alcoholism and mental impairments. *Id.* The ALJ stated that he could not give these lay opinions significant weight because they "are simply not consistent with the preponderance of the opinions and observations by medical doctors in this case." *Id.* Further, the ALJ found that they were not medically trained to make exacting observations making the accuracy of their statements questionable. *Id.* He also found that "by virtue of their relationship with [Plaintiff], they cannot be considered disinterested third-party witnesses whose statements would not tend to be colored by affection for [Plaintiff] and a natural tendency to agree with the symptoms and limitations [Plaintiff] alleges." *Id.*

In addition to evidence from acceptable medical sources, the ALJ "may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [their] ability to work." 20 C.F.R. § 404.1513(d); *De Olazabal v. Soc. Sec. Admin., Com'r,* 579 Fed.Appx. 827, 832 (11th Cir. 2014). "Other sources" include non-medical sources such as spouses, parents, other caregivers, siblings, other relatives, friends, neighbors, and clergy. 20 C.F.R. § 404.1513(d)(4). Social Security Ruling 06-03p provides:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these

"other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p.

Plaintiff contends that the ALJ erred by not giving more weight to the evidence from lay witnesses. [DE 17, pp. 13-14]. The ALJ clearly considered the opinions of these "non-medical sources" and explicitly stated what weight he gave them. [R. 23]. The ALJ's discussion of these opinions was well thought out and allows this Court to easily follow the ALJ's reasoning. The Court finds that the ALJ's conclusion in this regard was supported by substantial evidence.

The ALJ then stated that he gave little weight to the portion of the opinion evidence of the State agency medical consultant opining that Plaintiff could perform light work because it was inconsistent with the record evidence showing that Plaintiff had tachycardia and problems with her right side. *Id.* The Court finds that the ALJ's conclusion in this regard was also supported by substantial evidence.

Moreover, Plaintiff claims that she stopped working because of her conditions. [R. 226]. However, Plaintiff alleged at the hearing that she stopped working because her work was outsourced to India. [R. 37]. This could not be confirmed by any of the medical record evidence because Plaintiff was apparently untruthful with her doctors about when she stopped working. [R. DE 20, p. 2]. Although Plaintiff claims that this was a "pride-induced fabrication," Plaintiff has the burden to show that she can no longer perform her past relevant work as she actually performed it or as it is performed in the general economy.

Plaintiff's argument that the ALJ's RFC is not supported by substantial evidence is

without merit. The ALJ carefully considered all of the record evidence and explained in detail why he reached the ultimate conclusion that he reached. [R. 20-23]. The Court finds that the ALJ very clearly considered Plaintiff's entire medical condition in the aggregate in evaluating Plaintiff's RFC and the credibility of Plaintiff's subjective claims. In sum, the substantial record evidence supports the ALJ's RFC assessment, and the ALJ provided a sufficient explanation for how he reached Plaintiff's RFC and the conclusion that Plaintiff is not disabled.

### E. Whether the ALJ's hypotheticals to the vocational expert were comprised of all of Plaintiff's impairments

The ALJ also found that Plaintiff is able to perform her past relevant work as a nurse consultant based partly on the vocational expert's testimony. [R. 23]. An ALJ may utilize the services of a vocational expert to make a determination of whether a claimant can perform their past relevant work, given the claimant's residual functional capacity. 20 C.F.R. § 404.1560(b)(2). "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Gordon v. Astrue*, 249 Fed.Appx. 810 812 (11th Cir. 2007). However, the ALJ need only include in the hypothetical claimant's impairments that the ALJ has found to be supported by the evidence. *Id.* at 813.

Plaintiff asserts that the ALJ ignored the vocational expert's testimony and failed to reveal to the vocational expert the results of Plaintiff's neuropsychological testing, which occurred after the hearing. [DE 17, p. 19]. According to Plaintiff, the ALJ "selectively cited the expert's testimony in response to hypotheticals incorporating only [Plaintiff's] exertional limitations (weakness and tachychardia)." *Id.*

Defendant claims that the ALJ was not required to include in the hypothetical question to

the vocational expert any limitations that were not supported by the record or limitations that the ALJ rejected. [DE 18, pp. 18-19]. Defendant contends that the vocational expert's testimony provided substantial evidence to support the ALJ's decisions that Plaintiff can perform her past relevant work because the hypothetical included all of Plaintiff's credible functional limitations. [DE 18, p. 19].

In the first hypothetical, the ALJ described an individual of Plaintiff's age, education, and work history who could work at the light exertional level, except the individual could only frequently handle with the right hand, should not climb any ladders, ropes or scaffolds, and should avoid hazards such as unprotected heights and dangerous machinery. [R. 60]. The expert responded that such an individual could perform the past relevant work of a nurse consultant. *Id.* The expert then stated that the same individual could also perform work as a phlebotomist, first aid attendant, and a cardiac monitor technician. [R. 61].

In the next hypothetical, the ALJ described an individual with the same limitations as that described in the first hypothetical, except the individual could only work at the sedentary level. *Id.* The vocational expert indicated that such an individual could work as a nurse consultant and also a cardiac monitor technician. [R. 62].

The ALJ presented the vocational expert with a third hypothetical where an individual had the same limitations as that described in the first hypothetical, except the individual would not be able to work for eight hours a day for five days a week, or an equivalent schedule, because of the combination of the individual's impairments. *Id.* The expert responded that there would not be any work for one so limited. *Id.*

In the second hypothetical, the ALJ restricted Plaintiff to sedentary work, which sufficiently accounted for Plaintiff's impairments. The medical evidence demonstrates that

Plaintiff has the ability to perform sedentary work despite her limitations. *See Herrera v. Colvin*, No. 13-22058-CV, 2014 WL 4055717, *13 (S.D. Fla. Aug. 15, 2014). Although the ALJ did not include Plaintiff's mental impairments in the hypothetical to the vocational expert, the ALJ found in his decision that Plaintiff's mental impairments were not severe. [R. 20]. Therefore, the ALJ's hypothetical included all of Plaintiff's credible functional limitations. Further, the vocational expert's testimony that Plaintiff could perform her past relevant work as a nurse consultant provided substantial evidence to support the ALJ's conclusion that Plaintiff could perform her past relevant work as a nurse consultant.

The ALJ stated that the "vocational expert testified that the above residual functional capacity would not preclude the performance of this work as generally performed." [R. 23]. Based on this finding, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 15, 2012, through the date of this decision." [R. 24].

The hypothetical questions presented to the vocational expert by the ALJ were consistent with the medical record evidence and other evidence that the ALJ found to be supported by the evidence. Thus, the Court finds that the ALJ's hypotheticals to the vocational expert properly comprised all of Plaintiff's impairments.

## IV. CONCLUSION

The Court is not unsympathetic to Plaintiff, a woman who was 57 years old at the time of the hearing before the ALJ and is 60 years old today, and who was previously a very competent nurse consultant as reflected in the email from Calvin Warriner, Esq. [R. 297]. Plaintiff's family members have admirably rallied to support her, as reflected by their letters submitted in the record. *See, e.g.*, R. 283-85, 286-87, 288-96. However, the Court may not "decide facts

anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]."

*Phillips*, 357 F. 3d at 1240, n. 8. This Court's judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards. *See* Section III of this Order, *supra*, p. 20. In exercising its judicial review, the Court finds that there is substantial evidence to support the Commissioner's decision and that the decision is based upon proper legal standards.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 17] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 18] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 26th day of May, 2017.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE